UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: BOARD OF COMMISSIONERS, | CIVIL ACTION |
| AS OWNER OF THE M/V W.T. HOGG | NO. 20-780 |
| | SECTION "E" (1) |

ORDER AND REASONS

Before the Court is a Joint Motion to Increase the Limitation Fund, filed by Claimants Oscar Meza and Dennis Virgil.[1] The Board of Commissioners of the Port of New Orleans (the "Board") filed an opposition.[2] Claimants did not file a reply.

BACKGROUND

On September 10, 2019, Oscar Meza and Dennis Virgil, employees of the Board, were working as deckhands aboard the M/V W.T. HOGG (the "HOGG").[3] Meza and Virgil were operating a winch system on the HOGG when a steel anchor cable came out of a roller on top of an A-frame mounted on the HOGG, slid down the A-frame, and allegedly struck Meza and Virgil[4] and caused them to sustain serious injuries.[5]

On March 5, 2020, the Board filed a preemptive complaint for exoneration from and/or limitation of liability, seeking to cap its potential liability at the value of the HOGG at the time of the incident.[6] In its complaint, the Board states it "reasonably believes that the HOGG had a fair market value of approximately $615,000 at the time of and

---

[1] R. Doc. 62.
[2] R. Doc. 65.
[3] R. Doc. 1.
[4] *Id. See also* R. Docs. 5, 20.
[5] R. Docs. 5, 20.
[6] *See* R. Doc. 1.

1

immediately following the incident."[7] The Board cites to the affidavit of Timmy J. Anselmi, surveyor for Anselmi Maritime Consulting, L.L.C., in support of its contention the value of the HOGG was $615,000 at all relevant times.[8] The Board attached to its complaint an ad interim stipulation for the value of the HOGG.[9] The Board posted security in the form of a letter of undertaking.[10]

On March 6, 2020, the Court entered an order accepting, as to quantum, form, and surety, the ad interim stipulation for the Board's interest in the HOGG, in the principal amount of $615,000 plus 6% interest per annum.[11] The Court further ordered that notice be published in accordance with Rule F of the Supplemental Rules of the Federal Rules of Civil Procedure, and that commencement or further prosecution of any action or proceedings against the Board with respect to any claims for which the Board seeks exoneration or limitation be restrained.[12]

Meza and Virgil (collectively, "Claimants") responded to the Board's limitation complaint by filing claims for recovery under the general maritime law and the Jones Act.[13] Claimants contend that, given the severity of their injuries, the $615,000 in security will prove insufficient to satisfy their claims.[14] On October 1, 2021, Claimants filed a Rule F(7) motion seeking to increase the limitation fund[15] by invoking the flotilla doctrine.[16] If the flotilla doctrine applies, the vessel owner is not entitled to limit its liability unless it

---

[7] *See id.* at ¶ X.
[8] *See* R. Doc. 1-1.
[9] R. Doc. 1-3.
[10] R. Doc. 1-2.
[11] R. Doc. 4.
[12] *See id.*
[13] *See* R. Doc. 5 (Virgil) and R. Doc. 20 (Mezal).
[14] R. Doc. 62-2 at p. 1.
[15] R. Doc. 62.
[16] R. Doc. 62-2 at p. 3 *et seq.*

2

surrenders the value of all the vessels comprising the flotilla.[17] Claimants argue that, "[a]t the time of their injuries, the W.T. HOGG was engaged with other vessels in its routine work of dredging the Mississippi River," and that the limitation fund should be increase to reflect the value of all the vessels involved in this enterprise.[18] Additionally, Claimants contend the "agreed upon" value of the vessels involved as stated in the Board's hull insurance policy should control the valuation of the limitation fund in this case.[19]

## LEGAL STANDARD

Under the Limitation of Liability Act

the liability of the owner of a vessel for any claim, debt, or liability [arising from any embezzlement, loss, or destruction of any property, goods, or merchandise shipped or put on board the vessel, any loss, damage, or injury by collision, or any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of the owner] shall not exceed the value of the vessel and pending freight.[20]

When a vessel owner initiates a limitation of liability action by filing a preemptive petition for limitation of, or exoneration from, liability, the owner is required to deposit with the court an amount equal to the value of the owner's interest in the vessel involved in the incident and its pending freight, or approved security therefor.[21] Ordinarily, the Limitation of Liability Act permits a vessel owner to limit its liability for damages arising

---

[17] *See United States Dredging Corp. v. Krohmer*, 264 F.2d 339 (2d Cir. 1959); *see also Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 725 (5th Cir. 1967).
[18] *Id.* at p. 2.
[19] *Id.* at p. 10.
[20] 46 U.S.C. § 30505 (a)–(b).
[21] *Id.* § 30511(b) ("When the action is brought, the owner (at the owner's option) shall—(1) deposit with the court, for the benefit of claimants—(A) an amount equal to the value of the owner's interest in the vessel and pending freight, or approved security; and (B) an amount, or approved security, that the court may fix from time to time as necessary to carry out this chapter; or (2) transfer to a trustee appointed by the court, for the benefit of claimants—(A) the owner's interest in the vessel and pending freight; and (B) an amount, or approved security, that the court may fix from time to time as necessary to carry out this chapter.")

from a maritime accident to the value of the owner's interest in the vessel directly involved in the accident.[22]

After a vessel owner posts security in the amount of the value of the vessel owner's interest, persons with claims against the vessel owner may challenge the amount of the security posted by seeking to increase the limitation fund.[23] Procedurally, courts in the Fifth Circuit consider challenges to a shipowner's invocation of the Limitation of Liability Act through more than one type of device.[24] A motion under Supplemental Admiralty Rule F(7) is one method to challenge the amount of the limitation fund when a limitation fund already exists.[25] Supplemental Admiralty Rule F(7) provides:

> Any claimant may by motion demand that the funds deposited in court or the security given by the plaintiff be increased on the ground that they are less than the value of the plaintiff's interest in the vessel and pending freight. Thereupon the court shall cause due appraisement to be made of the value of the plaintiff's interest in the vessel and pending freight; and if the court finds that the deposit or security is either insufficient or excessive it shall order its increase or reduction. In like manner any claimant may demand that the deposit or security be increased on the ground that it is insufficient to carry out the provisions of the statutes relating to claims in respect of loss of life or bodily injury; and, after notice and hearing, the court may similarly order that the deposit or security be increased or reduced.[26]

---

[22] *ODECO II, Odeco Oil and Gas v. Bonnette*, 74 F.3d 671, 674 (5th Cir.1996).
[23] *See In re Drill Barge No. 2*, 454 F.2d 408 (5th Cir. 1972).
[24] *See Foret v. Transocean Offshore (USA), Inc.,* No. CIV.A. 09-4567, 2011 WL 3818635, at *4 (E.D. La. Aug. 29, 2011). The different procedural methods courts in the Fifth Circuit have considered raising challenges to a shipowner's invocation of the Limitation of Liability Act are motions under Supplemental Admiralty Rule F(7), and motions for summary judgment. *See id.*
[25] *See In re Drill Barge No. 2*, 454 F.2d 408 (5th Cir. 1972); *see also Matter of Falcon Workover Co., Inc.*, No. CIV. A. 98-0005, 1998 WL 760397, at *2 (E.D. La. Oct. 27, 1998), *and In Matter of Offshore Specialty Fabricators, Inc.,* No. CIV.A.01-2227, 2002 WL 827398, at *2 (E.D. La. Apr. 30, 2002). *Compare Matter of A. & J. Towing, Inc.*, No. CIV. A. 97-0548, 1997 WL 289396, at *3 (E.D. La. May 29, 1997) (entertaining a summary judgment motion as a means for invoking the flotilla doctrine) and *Foret v. Transocean Offshore (USA), Inc.*, No. CIV.A. 09-4567, 2011 WL 3818635 (E.D. La. Aug. 29, 2011) (considering flotilla doctrine issue raised in a motion for summary judgment where limitation of liability act was invoked as a defense and not in a limitation petition).
[26] Fed. R. Civ. P. Supp. R. F(7).

The flotilla doctrine provides a substantive avenue for claimants to challenge a vessel owner's attempt to limit its liability[27] by allowing them to assert the value of the limitation fund supplied by the vessel owner is insufficient because it does not cover the value of all the vessels engaged in an enterprise.[28] As the movants under Supplemental Admiralty Rule F(7), claimants bear the burden of making "at least a minimum showing as to why the valuation of the vessel is inadequate" under the flotilla doctrine.[29]

## LAW AND ANALYSIS

Claimants do not dispute that in general a vessel owner may limit its liability for claims against it to the value of the vessel giving rise to the claim. Claimants argue in this case the $615,000 security provided will prove insufficient to satisfy their claims, and that this amount is a legally insufficient amount because the EDWARD "NED" REED, the M/V CAPTAIN POWER, the SKIDDER BARGE known as the AB-12, the W.T. HOGG, and the floating pipeline segments (referred to collectively as the "dredge unit") all were engaged in the Board's routine work of dredging the Mississippi River and qualify as a flotilla.[30]

Claimants argue the combined value of all the vessels in a flotilla is used to determine the owner's maximum liability when a seaman is injured in the service of a flotilla of vessels,[31] and that the value of the limitation fund should include all of the vessels involved.[32] Specifically, Claimants argue the value of the limitation fund in this case should be increased "to reflect the value of the flotilla of vessels that work in

---

[27] *See Cenac Towing Co., Inc. v. Terra Resources Inc.,* 734 F.2d 251, 254 (5th Cir.1984); *see also Foret,* 2011 WL 3818635, at *4.
[28] *See Cenac,* 734 F.2d 251 and *Foret,* 2011 WL 3818635.
[29] *D & L Marine Transp., Inc. v. Suard Barge Serv.,* 2002 U.S. Dist. LEXIS 2448, at 3 (E.D. La. Jan. 25, 2002).
[30] R. Doc. 62-2 at pp. 2–3.
[31] R. Doc. 62-2 at p. 3.
[32] *Id.*

conjunction with the M/V W.T. HOGG to dredge the Mississippi [River] in fulfillment of the Board's obligations."[33]

## I. The flotilla doctrine applies because the vessels are: 1) owned by the same person, 2) under a single command, and 3) engaged in a common enterprise.

The Fifth Circuit has endorsed the flotilla doctrine and held that in order for a shipowner to limit liability, "all vessels which take part in the undertaking must be surrendered."[34] As a result, when the flotilla doctrine applies, the value of all the vessels in the flotilla must be included in the limitation fund.[35] The flotilla doctrine requires a limitation fund to include the value of all vessels engaged in an enterprise when the vessels are: 1) owned by the same person, 2) under a single command, and 3) engaged in a common enterprise.[36]

The parties do not dispute that the first two elements are met in this case. To be sure, the common ownership element is clearly met in this case as the vessels in question are owned by the Board. The Board attached the affidavit of John Guidry, director of Maintenance for the Board, to its opposition to the Claimant's motion to increase the limitation fund.[37] John Guidry attests the Board owns all the vessels at issue in this case.[38] The single command element also is met in this case. Marine Operator Christopher Videau testified Marine Dredge Captain Eddie Angellette is the captain of the dredge,[39] and Captain Eddie is the "number one" when he's aboard.[40] The Board does not contest

---

[33] R. Doc. 62-2 at p. 3.
[34] *Brown & Root Marine Operators, Inc. v. Zapata Off–Shore Company*, 377 F.2d 724, 727 (5th Cir.1967).
[35] *In re Drill Barge No. 2*, 454 F.2d 408, 412 (5th Cir. 1972).
[36] *Foret v. Transocean Offshore (USA), Inc.*, No. CIV.A. 09-4567, 2011 WL 3818635, at *4 (E.D. La. Aug. 29, 2011) (quoting *Cenac Towing Co. v. Terra Res., Inc.*, 734 F.2d 251 (5th Cir. 1984)).
[37] *See* R. Doc. 65-3 at p. 1.
[38] *Id.*
[39] R. Doc. 62-4 at pp. 15–16.
[40] *Id.* at pp. 20–22.

Claimants' argument that all the vessels at issue were under the single command of Captain Eddie, and the Court finds the evidence presented substantiates Claimants' arguments on this point. Captain Eddie is the manager in charge of all the deckhands, all the other captains, and all marine operators employed by the Board.[41] Captain Eddie is responsible for the day-to-day operations of the "NED" REED, the HOGG, the CAPTAIN POWER, the SKIDDER BARGE, and the pipeline segments.[42]

The parties dispute whether the third element—the common enterprise element—is met in this case. Claimants contend the EDWARD "NED" REED, a dredge barge; the M/V CAPTAIN POWER, a tender; the non-propelled anchor barge, referred to as the SKIDDER BARGE or the AB-12; the self-propelled anchor handling barge, the M/V W.T. HOGG; and the floating pipeline segments are vessels and floating equipment used by the Board as a unit to dredge the Mississippi River.[43]

It is undisputed that the Board is statutorily obligated to maintain proper depths at all wharves and landings of the Port of New Orleans.[44] To "maintain proper depths," the Board dredges the Mississippi River at and near the Port of Orleans. In order to dredge, the Board operates, in coordination, a number of vessels, platforms, and other floating equipment.[45] The EDWARD "NED" REED (the "dredge") is a cutter suction dredge.[46] The SKIDDER BARGE is a platform used in conjunction with the dredge. The M/V CAPTAIN POWER is a tender, and is also described as a push boat.[47] The M/V W.T.

---

[41] R. Doc. 62-4 at p. 58.
[42] *Id.*
[43] R. Doc. 62-2 at pp. 4–5.
[44] La. R.S. § 34:21.B(5).
[45] R. Doc. 62-4 at p. 24; R. Doc. 62-5 at p. 18.
[46] R. Doc. 62-4 at p. 27.
[47] *Id.* at p. 23.

HOGG is a "self-propelled flat deck barge."[48] The M/V W.T. HOGG is 50.2 feet in length, 24.6 feet in breadth, and weighs 60 gross tons.[49] According to the Board's marine surveyor, the M/V W.T. HOGG "serves as an inland dredge tender, serving the Cutterhead Dredge 'EDWARD S. NED REED' in the lower Mississippi River at and near the Port of New Orleans."[50] Marine Operator III Videau describes the M/V W.T. HOGG as a "push boat" and "an anchor handling barge."[51]

Claimants argue the vessels and floating equipment comprising the dredge unit—namely, the "NED" REED, the CAPTAIN POWER, the HOGG, the SKIDDER BARGE,[52] and floating pipeline segments—were engaged in a common enterprise at the time of the incident. The Board disputes this and argues there was no common enterprise being pursued in this case. To resolve this dispute, the Court must first examine the relationships of these vessels in light of the obligations the Board was pursuing at the time of the incident.

The deposition testimony of several Board employees establishes that each piece of equipment in the dredge unit performs a necessary function in the Board's dredging operations. The NED REED has a cutter head and dredging ladder which moves along the river bottom to remove sediment and debris.[53] To move the cutterhead along the river bottom, the dredging ladder swings from side to side with the assisted motion from swing wires.[54] An anchor is connected by cables to the HOGG and the NED REED, and the A frame mounted on the HOGG assists in raising and lowering the anchor so the NED REED

---

[48] R. Doc. 65-4 at p. 23.
[49] *Id.* at p. 1.
[50] R. Doc. 65-4 at p. 2.
[51] R. Doc. 62-4 at p. 23.
[52] Possibly also referred to as the AB-12. *See* R. Doc. 62-4 at p. 24.
[53] R. Doc. 62-5 at p. 50; R. Doc. 62-4 at p.
[54] R. Doc. 62-5 at p. 52.

can walk forward during dredging operations.[55] Floating pipeline segments, which serve as a conduit for removed material, are tied together and hooked to the dredge and the SKIDDER BARGE.[56] Sediment and debris removed from the river bottom are sucked through a pump on the dredge, into the floating pipeline segments, and are discharged beyond the SKIDDER BARGE into the channel so the discharged material is deposited downstream.[57] The CAPTAIN POWER is used to sound the river bottom depths[58] and to set up and break down the pipeline segments between the SKIDDER BARGE and the NED REED at the start and end of dredging operations.[59] The CAPTAIN POWER and the HOGG are the only two self-propelled vessels employed by the Board in its dredging operations.[60] Accordingly, the NED REED, SKIDDER BARGE, and pipeline segments cannot be moved on or off location without the HOGG or the CAPTAIN POWER.[61] At the time of the incident giving rise to this litigation, the dredge unit was being set up to begin dredging. The Court finds that each piece of equipment in the dredge unit performs a necessary function in the Board's venture or enterprise of maintaining the Mississippi River and the common enterprise element is satisfied.

The Board also argues that, even if these vessels and equipment were engaged in a common venture or enterprise, the flotilla doctrine does not apply because the vessels and equipment at issue are not contractually engaged to a third party to complete the common venture or enterprise.[62] Through the affidavit attached to the Board's opposition, the

---

[55] R. Doc. 62-5 at p. 54; R. Doc. 62-7 at p. 11.
[56] R. Doc. 62-5 at p. 17.
[57] *Id.* at pp. 50–51.
[58] R. Doc. 62-7 at p. 11.
[59] R. Doc. 62-7 at p. 11.
[60] R. 62-4 at pp. 22–23.
[61] *Id.* at p. 23.
[62] R. Doc. 65 at p. 2.

9

Board attests that its vessels were not working pursuant to any contract with any entity in September 2019.[63] The Board argues the flotilla doctrine does not apply because the Board's vessels were not "working pursuant to any contract at any time period relevant to this litigation."[64]

Claimants recognize "[t]here are references in the flotilla cases to the vessels working in a common venture toward the fulfillment of 'contractual obligations' which can serve as a limit to the application of the doctrine."[65] Nevertheless, Claimants argue that, in this case, "no contract is required because the [Board's] obligation is imposed upon the Board directly by the Legislature through statute. The effect is the same whether the obligation is contractual or statutory."[66]

The Board cites the following cases in support of its argument that the flotilla doctrine is applicable only when the vessels are *contractually* engaged in a common enterprise: *In Matter of Offshore Specialty Fabricators, Inc.*,[67] and *In re Falcon Workover Co., Inc.*[68] *In Matter of Offshore Specialty Fabricators, Inc.* and *In re Falcon Workover Co., Inc.* both hold that the flotilla doctrine applies when the vessel are owned by the same person, contractually engaged in a common enterprise, and under a single command.[69] For the proposition that the vessels must be contractually engaged in a common enterprise under the flotilla doctrine, these cases cite to *Brown & Root Marine*

---

[63] R. Doc. 65-3 at p. 1.
[64] R. Doc. 65 at p. 2.
[65] R. Doc. 62-2 at p. 8 n.6.
[66] *Id.*
[67] No. 01-2227, 2002 WL 827398 (E.D. La. April 30, 2002).
[68] No. 98-0005, 1999 WL 243657 (E.D. La. April 21, 1999).
[69] *See In Matter of Offshore Specialty Fabricators, Inc.*, 2002 WL 827398 at *2; *see also In re Falcon Workover Co., Inc.*, 1999 WL 243657 at *5.

10

*Operators, Inc. v. Zapata Off–Shore Co.*,[70] *In re Drill Barge No. 2*,[71] *Cenac Towing Co. v. Terra Res., Inc.*,[72] and *In re Tom-Mac, Inc.*[73]

These cited cases do not hold the flotilla doctrine is inapplicable unless the vessels at issue are contractually engaged to a third party to complete a common venture. In *Brown & Root v. Zapata*, Brown & Root filed a petition for exoneration or limitation of liability as owner of the barge MM-71 for damage to Zapata Offshore Company's offshore gas well equipment.[74] In that case Brown & Root did enter a contract with Zapata and in carrying out the contract, Brown & Root employed several of its vessels, to wit, the MM-71, a non-self-propelled barge which was used to carry material and as a welding and work platform; the H.A. LINDSAY, a non-self-propelled derrick barge serving as headquarters for vessel operations; and the PAN-AMERICAN, a self-propelled tug used to move the other two barges as needed.[75] Zapata contended Brown & Root was not entitled to proceed under the Limitation of Liability Act unless it surrendered the H.A. LINDSAY and the PAN-AMERICAN in addition to the MM-71.[76] The court in *Brown & Root* pointed out that the central factor in determining whether the vessels constitute a flotilla is their interdependence.[77] The court did not hold that the vessels *must* be contractually engaged to a third party to complete a common enterprise for the flotilla doctrine to apply.

In *In re Drill Barge No. 2*, the court explained a vessel owner is required to surrender all of the vessels constituting a flotilla when all such vessels were engaged in

---

[70] 377 F.2d 724 (5th Cir. 1967).
[71] 454 F.2d 408 (5th Cir.), *cert. denied*, 406 U.S. 906 (1972).
[72] 734 F.2d 251 (5th Cir. 1984).
[73] 76 F.3d 678 (5th Cir. 1996).
[74] 377 F.2d 724, 725 (5th Cir. 1967).
[75] *Id.*
[76] *Id.*
[77] *Id.* at 727 (citing *United States Dredging Corp. v. Krohmer*, 264 F.2d 339 (2d Cir. 1959)).

11

the same venture and owned in common.[78] The court found the vessels were engaged in a common venture because the petitioner used a number of vessels and other equipment in constructing a flood control levee. Though the petitioner in that case was working a flotilla of vessels pursuant to contractual obligations to a third party, the court did not hold there that the vessels must be contractually engaged to a third party for there to be a common enterprise. In *Cenac Towing Company v. Terra Resources*, the Fifth Circuit again addressed the flotilla doctrine and explained the "flotilla doctrine require[s] the tender of all the vessels in a flotilla where all such vessels were not only owned by the same person, but were also both engaged in a common enterprise and under a single command."[79] Reiterating its holding from *Cenac*, the Fifth Circuit in *Complaint of Tom-Mac, Inc.* stated the flotilla doctrine applies "[w]here vessels are owned by the same person, engaged in a common enterprise, and under a single command."[80] Absent from the holdings of these four cases is the requirement that the common enterprise in which the vessels are engaged must arise from a contract with a third party.[81]

In cases in which the court found the flotilla of vessels was engaged in a common enterprise, the court looked to the interdependence of the vessels in light of the overall project—that is, the court focused on the facts demonstrating that each of the vessels was

---

[78] *In re Drill Barge No. 2*, 454 F.2d 408, 410 (5th Cir.), *cert. denied*, 406 U.S. 906 (1972) ("A tug and her barge were treated as a single vessel because owned in common and engaged in a common enterprise.") (quoting *Standard Dredging Co. v. Kristiansen*, 67 F.2d 548, 550 (2d Cir.1933)).

[79] *Cenac Towing Co. v. Terra Res., Inc.*, 734 F.2d 251, 254 (5th Cir. 1984) ((citing *Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co.*, 377 F.2d 724, 727 (5th Cir.1967) and *In re Drill Barge No. 2*, 454 F.2d 408).

[80] *Complaint of Tom-Mac, Inc.*, 76 F.3d 678, 684 (5th Cir. 1996).

[81] To the extent the early flotilla doctrine cases, and the Fifth Circuit's flotilla doctrine cases, distinguish between injuries to third persons and injuries incidental to a contract, the employment relationship between the Board and the Claimants in this case provides the necessary contractual obligations. *See Kristiansen*, 67 F.2d at 550 ("when the duty violated, though imposed by law, presupposes at least the relation of master and servant, the owner must surrender all those vessels which share in the execution of the venture."); *see also In re Waterman S.S. Corp.*, 794 F. Supp. 601, 604 (E.D. La. 1992) ("[n]umerous Fifth Circuit cases have found the necessary contractual link in the injured or killed seaman's employment contract in order to invoke the flotilla or single enterprise theory.").

necessary for performance of the work. For example, in *Standard Dredging Co. v. Kristiansen*,[82] a seaman employed in service of a dredge was injured on a chartered tender barge which was used to supply oil to the dredge.[83] The Second Circuit in *Kristiansen* held that both the dredge and the chartered tender barge must be surrendered because they were each engaged in the same business.[84] In *United States Dredging Corp. v. Krohmer,*[85] the Second Circuit held that when a dredge depended on attending vessels for propulsion and for transportation of its crew and supplies, the attending vessels and the dredge were engaged in a common venture and thus constituted a flotilla.[86] The Second Circuit noted that the district court had affirmed the commissioner's factual finding that "'[i]t was impossible for the dredge to operate and work unless some craft brought the crews aboard, transported the water and fuel barges to and from the dredge, lifted the anchors, towed away the gravel barges and towed the dredge from place to place.'"[87] The Second Circuit further held that all vessels were subject to surrender.[88] In *In Matter of Offshore Specialty Fabricators, Inc.*, the district court found the M/V OFFSHORE MONARCH, the MV FRITZI K, and the DB-1 were engaged in a common enterprise because

> [t]he M/V OFFSHORE MONARCH had performed necessary work on this phase of the project by towing the DB-1 to the job site. The M/V FRITZI K also was necessary to the project: it had journeyed toward the DB-1 to assist it in case of bad weather as well as taken on fuel to transfer to the DB-1, fuel intended to be used in the work in which the DB-1 was engaged. Additionally, the DB-1 had at least performed some work on the contractual job prior to the bad weather.[89]

---

[82] 67 F.2d 548 (2d Cir.1933).
[83] *Id.* at 550.
[84] *Id.*
[85] 264 F.2d 339, 339 (2d Cir. 1959).
[86] 264 F.2d at 341.
[87] *Id.* at 340.
[88] *Id.* at 341.
[89] No. CIV.A.01-2227, 2002 WL 827398, at *3 (E.D. La. Apr. 30, 2002).

13

In the instant case, at the time of the incident giving rise to Claimants' alleged injuries, the Board's vessels and other floating equipment were engaged together in pursuit of a common venture—namely, dredging the Mississippi River in accordance with the Board's statutory obligation of maintaining proper depths at all wharves and landings of the Port of New Orleans. The fact that the dredge unit was pursuing an enterprise arising from statutory—as opposed to contractual—obligations is immaterial because the vessels and floating equipment were working together in pursuit of a common venture. The Court rejects the Board's argument that the flotilla doctrine is applicable only when the Board's vessels were working pursuant to a contract with a third party.

In sum, the various vessels and pieces of floating equipment in the dredge unit all were owned in common by the Board, were engaged in a common venture, and were under the single command of Captain Eddie. All three elements of the flotilla doctrine are met in this case. As a result, all of the vessels and pieces of floating equipment comprising the dredge unit together constituted a flotilla. The Board must post security equal to the value of all vessels and floating equipment comprising the dredge unit.

## II. The insured value is one factor to consider when determining the fair market value of the dredge unit.

Claimants argue that, because the Board and its insurer agreed the combined value of all the vessels in the dredge unit in 2019 was $18,500,000, this "agreed upon" value should control the valuation of the limitation fund in this case.[90] Claimants do not cite any cases in support of this contention. The Board argues a vessel owner in a limitation action is required only to post security reflecting the fair market value of the vessel and

---

[90] R. Doc. 62-2 at pp. 10–11.

its pending freight at the end of the voyage.[91] The Board argues "while courts may look to the amount of insurance as one variable to consider, there are more accurate ways to determine a vessel's value."[92] The Board asserts it hired a marine surveyor and that the surveyor "utilized both the sales comparison approach and the cost approach to determine the fair market value of the M/V W.T. HOGG," but that because "there were no vessels similar to the M/V W.T. HOGG for sale on the market," the surveyor "relied upon the cost approach to estimate the fair market value of the M/V W.T. HOGG."[93] The Board asserts that, pursuant to the cost approach, the surveyor estimated the HOGG had a fair market value of $615,000.[94] The Board argues the actual value, rather than the agreed upon value in the insurance policy, should be controlling in determining the fair market value, and that the surveyor's valuation of the HOGG should trump the agreed value in its hull insurance policy.[95]

In an action under the Limitation of Liability Act, the "security posted should reflect the fair market value of the vessel and any pending freight at the end of the voyage."[96] In determining a vessel's fair market value, courts look first to evidence of contemporaneous sales of comparable vessels.[97] When fair market value cannot be established through contemporaneous sales, courts may consider "other indicia of value, such as replacement costs appropriately depreciated, less the cost of repairs, or the

---

[91] R. Doc. 65 at p. 5.
[92] *Id.*
[93] *Id.*
[94] *Id.*
[95] *Id.* at p. 6.
[96] *Ergon-St. James, Inc. v. Privocean M/V*, No. CV 15-1121, 2015 WL 9688148, at *1 (E.D. La. Aug. 21, 2015), *aff'd sub nom. Ergon–St. James, Inc. v. Privocean M/V*, 654 F. App'x 184 (5th Cir. 2016).
[97] *See id; see also SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 777 (E.D. La. 2019).

insured value of the vessel,"[98] as well as the opinions of marine surveyors and engineers.[99] In *Standard Oil Company of New Jersey v. Southern Pacific Co*mpany, the Supreme Court pointed out that, in numerous cases, the Court has "firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value" where there is no evidence of contemporaneous sales.[100] Thus, although the amount of insurance is one factor to be considered in determining a vessel's fair market value, it is by no means determinative in every case.

The Claimants' motion, to the extent they seek to have the fair market value of the dredge unit set at the insured value of $18,500,000, is denied. The insured value is one factor that may be considered in setting the fair market value.

To maintain its limitation action, the Board must file an amended ad interim stipulation. It is hoped the parties will agree to a stipulated value for the EDWARD "NED" REED, the SKIDDER BARGE or AB-12, the M/V CAPTAIN POWER, the M/V W.T. HOGG, and the floating pipeline segments. If the parties are unable to reach an agreement as to the stipulated value, the Board must obtain a survey of the vessels' fair market value at the Board's expense, as set forth below.

## CONCLUSION

**IT IS ORDERED** that Claimant's Joint Motion to Increase the Limitation Fund[101] is **GRANTED IN PART AND DENIED IN PART.** The motion is granted to the extent

---

[98] *SCF Waxler Marine LLC*, 427 F. Supp. at 777-78.
[99] *See Ergon-St. James, Inc.*, 2015 WL 9688148, at *1 ("While comparable and contemporaneous sales are generally the best evidence from which to establish market value, the Court may also consider factors such as "the opinion of marine surveyors, engineers, the cost of reproduction, less depreciation, the condition of repair in which the vessel was in, the uses to which it can be put, the amount of insurance that the underwriters have issued, and the like" where it finds the evidence of such sales is insufficient.")
[100] *Standard Oil Co. of New Jersey v. S. Pac. Co*., 268 U.S. 146, 156 (1925) (collecting cases).
[101] R. Doc. 62.

the Claimants seek, pursuant to the flotilla doctrine, to increase the limitation fund to an amount equal to the value of all vessels and floating equipment comprising the dredge unit. The motion is denied to the extent the Claimants seek to have the fair market value of the dredge unit set at the insured value of $18,500,000.

**IT IS FURTHER ORDERED THAT** counsel for the parties meet and confer on or before **Wednesday, December 22, 2021** in an attempt to agree on the value of the dredge unit, and, if successful, the Board shall file an amended interim stipulation in that amount on or before **Wednesday, January 5, 2022**.

**IT IS FURTHER ORDERED THAT**, if the parties are unable to reach an agreement as to the stipulated value of the dredge unit, the Board shall obtain a survey of the value of the dredge unit by an independent third party, and file an amended ad interim stipulation for the value of the dredge unit, together with security in the form of a letter of undertaking, on or before **Friday, January 14, 2022**.

**New Orleans, Louisiana, this 15th day of December, 2021.**

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**